IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

EARL FORREST,                          )
                                       )
                    Petitioner,        )
                                       )
v.                                     )          Case No.  09-8002-CV-W-ODS
                                       )
TROY STEELE,[1]                        )
                                       )
                    Respondent.        )

ORDER AND OPINION (1) DENYING MOTION FOR DISCOVERY AND (2) DENYING
PETITION FOR WRIT OF HABEAS CORPUS

        Pending is Petitioner's Petition for Writ of Habeas Corpus filed pursuant to 28

U.S.C. § 2254.  Petitioner's Motion for Discovery is also pending.  Both the motion (Doc.

# 31) and the Petition (Doc. # 22) are denied.


                              I.  BACKGROUND


        The underlying facts were summarized by the Missouri Supreme Court as

follows:

        On December 9, 2002, Appellant, who had been drinking, and his
        girlfriend, Angelia Gamblin, drove to Harriett Smith's home.  Appellant and
        Smith apparently had a falling out over a dishonored agreement with
        Smith to purchase a lawn mower and a mobile home for Appellant in
        exchange for Appellant introducing Smith to a source for
        methamphetamine.  Appellant demanded that Smith fulfill her part of the
        bargain.  During the ensuing melee, Appellant shot Michael Wells, a visitor
        at the Smith residence, in the face killing him.  He also killed Smith,
        shooting her a total of six times.

        Appellant removed a lockbox from Smith's home containing
        approximately $25,000 worth of methamphetamine and returned to his
        home with Gamblin, where a shootout with the police ensued. Appellant
        shot Sheriff Bob Wofford in the abdomen wounding him.  He killed Deputy

───────────────

        [1]Troy Steele is substituted as the Respondent pursuant to Rule 25(d).

Sharon Joann Barnes, shooting her once in her chest and a second time in the back of her head. Appellant sustained a bullet wound to his face. Gamblin was shot twice, once in her shoulder and once in her back.

Appellant finally surrendered and was charged with three counts of first-degree murder for the deaths of Smith, Wells and Barnes. The jury found Appellant guilty on all three counts. During the penalty phase, the jury found the presence of multiple statutory aggravators to support its unanimous recommendation for a death sentence for each of the three murders. With regard to the murder of Harriett Smith, the jury found that: (1) her murder was committed while Appellant was engaged in the commission of another unlawful homicide, that of Michael Wells; and (2) Appellant murdered Smith for the purpose of receiving something of monetary value. The statutory aggravator found in relation to Michael Wells's murder was that he too was murdered for pecuniary gain. The murder of Joann Barnes carried the statutory aggravator of being committed against a peace officer while engaged in the performance of her official duty.

State v. Forrest, 183 S.W.3d 218, 223 (Mo. 2006) (en banc), cert. denied, 549 U.S. 840 (2006) (footnote omitted).

The conviction and sentence were affirmed on direct appeal. The trial court denied postconviction relief, and this decision was affirmed. Forrest v. State, 290 S.W.3d 704 (Mo. 2009) (en banc). Petitioner then instituted proceedings in the Missouri Supreme Court that were treated as a Petition for Writ of Habeas Corpus. The Missouri Supreme Court designated the trial judge to be a Special Master. The Special Master issued his findings and recommendations in May 2010, and on August 31, 2010, the Missouri Supreme Court denied the Petition for Writ of Habeas Corpus.

The Court's review of the Record, including particularly the Trial Transcript (hereinafter "T.Tr.") reveals that the defense theory did not involve denying that Petitioner killed Smith, Wells, or Barnes. Instead, the defense attempted to persuade the jury that Petitioner did not have the mental state required for first degree murder. Additional facts about the crimes and the underlying proceedings will be discussed as they become relevant to Petitioner's claims.

2

## II. DISCUSSION

Pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a writ of habeas corpus shall not be issued on a claim litigated on the merits in state court unless the state court's decision

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The "contrary to" and "unreasonable application" provisions in the first subsection have independent meaning.  The "contrary to" provision applies "if the state court arrive at a conclusion opposite to that reached by the Supreme Court on a question of law, or reached a decision contrary to Supreme Court precedent when confronting facts that were materially indistinguishable."  Jackson v. Norris, 651 F.3d 923, 925 (8th Cir. 2011).  The "unreasonable application" clause applies "if the state court correctly identified the governing legal principle, but unreasonably applied it to the facts of the particular case."  Id.  With respect to the facts, AEDPA commands deference to the factual determinations of the state courts.  This deference cannot be overcome simply by marshaling the contrary evidence from the Record.  Resolution of factual issues often requires reconciling contrary evidence or ascertaining which of two contradictory statements to believe.  Recounting contrary evidence will not automatically demonstrate a factual finding is "unreasonable . . . in light of the evidence presented in the State court proceeding."

Most of Petitioner's claims assert ineffectiveness on the part of trial counsel and are governed by the standard set forth in Strickland v. Washington, 466 U.S. 668 (1984).  "This standard requires [the applicant] to show that his 'trial counsel's performance was so deficient as to fall below an objective standard of reasonable competence, and that the deficient performance prejudiced his defense.'" Nave v. Delo,

62 F.3d 1024, 1035 (8th Cir. 1995), <u>cert. denied</u>, 517 U.S. 1214 (1996) (quoting <u>Lawrence v. Armontrout</u>, 961 F.2d 113, 115 (8th Cir. 1992)). This analysis contains two components: a performance prong and a prejudice prong.

> Under the performance prong, the court must apply an objective standard and "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance," <u>Strickland</u>, 466 U.S. at 690, while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. <u>Id</u>. at 689. Assuming the performance was deficient, the prejudice prong "requires proof 'that there is a reasonable probability that, but for a counsel's unprofessional errors, the result of the proceeding would have been different.'" <u>Lawrence</u>, 961 F.2d at 115 (quoting <u>Strickland</u>, 466 U.S. at 694).

<u>Id</u>. Failure to satisfy both prongs is fatal to the claim. <u>Pryor v. Norris</u>, 103 F.3d 710, 713 (8th Cir. 1997) (no need to "reach the performance prong if we determine that the defendant suffered no prejudice from the alleged ineffectiveness"); <u>see also</u> <u>DeRoo v. United States</u>, 223 F.3d 919, 925 (8th Cir. 2000). "An ineffective assistance of counsel claim is a mixed question of law and fact." <u>McReynolds v. Kemna</u>, 208 F.3d 721, 723 (8th Cir. 2000). Consequently, the state courts' findings of historical fact are entitled to a presumption of correctness, and their application of <u>Strickland</u> to those facts must stand unless they applied those standards in an unreasonable manner.

## A. Defense Counsel's Failure to Call Certain Witnesses During the Penalty Phase

In his first claim, Petitioner contends his trial counsel was ineffective for failing to investigate and present several pieces of mitigating evidence during the penalty phase. Specifically, he faults trial counsel for (1) failing to obtain a PET scan of his brain and elicit testimony from a doctor (such as Dr. David Preston, who testified at the postconviction proceeding), (2) failing to introduce medical records of Petitioner's prior head injuries, (3) failing to present testimony from Dr. Mark Cunningham to establish that Petitioner would not present a danger to other prisoners or prison staff and (somewhat paradoxically) that Petitioner's "childhood development contained several

4

risk factors that put him at risk to commit violence," and (4) failing to present testimony from an employer, a childhood friend, and a neighbor. Consideration of these claims requires a general understanding of the evidence presented during the penalty phase, which the Court will organize based on the claims at issue.[2]

### 1. PET Scan and Medical Records

Defense Counsel[3] elicited testimony from Dr. Robert Smith, a clinical psychologist and certified addiction specialist, to support the defense theory that Petitioner lacked the mental state required for first degree murder. Dr. Smith's evaluations prior to trial caused him to believe Petitioner suffered from dysthymic disorder (a form of depression), brain injury or damage, and substance abuse or addiction. Dr. Smith described how these conditions combined to cause difficulty in concentration and problem-solving and mood swings. Dr. Smith also testified during the penalty phase, and his testimony was consistent with his guilt-phase testimony. Defense Counsel also elicited testimony from Dr. Michael Gelbort, a clinical neuropsychologist who testified his evaluation caused him to believe Petitioner had brain damage. As part of his evaluation, Dr. Gelbort considered aspects of Petitioner's medical history as reported by Petitioner, including past events when Petitioner suffered

---

[2]Petitioner contends the Missouri Supreme Court's decisions on these issues are contrary to law because they considered each instance of ineffectiveness separately and not cumulatively. This argument is foreclosed by Eighth Circuit precedent. E.g., Middleton v. Roper, 455 F.3d 838, 851 (8th Cir. 2006), cert. denied, 549 U.S. 1134 (2007). Moreover, Petitioner's argument only makes sense when combining the prejudicial effects of deficient conduct. In other words, if a particular act or omission does not violate Strickland's performance prong, there is no principled reason to consider the prejudicial effect supposedly arising from that act or omission.

[3]Petitioner was represented by two attorneys at trial: Sharon Turlington and David Kenyon. Neither of them had sole responsibility for the guilt or penalty phase of the trial, although they did divide the witnesses. As a general matter there is no need to distinguish between actions taken by Turlington and actions taken by Kenyon. The term "Defense Counsel" will refer to Kenyon, Turlington, or both.

5

head injuries. T.Tr. at 1545. When asked if medical testing would reveal the injuries described, Dr. Gelbort stated in part that "MRI, CT look at the structure, PET or SPECT scan is another way to look at if the structures are using normal amounts of energy. Those may – those could possibly show up with problems in this type of a condition, but they were not given." T.Tr. at 1555. Finally, Dr. Lee Evans, a psychiatric pharmacist and the dean of the School of Pharmacy at Auburn University, testified about the effects of alcohol and methamphetamine on the brain and the effect those substances had on Petitioner the day of the murders.

Generally speaking, a PET scan can reveal diminished energy usage in particular areas of the brain, thereby signifying damage. However, it cannot show the cause of damage, nor can it demonstrate the existence of diminished capacity, predict future behavior, or establish a person's state of mind. Dr. Preston testified that a PET scan performed on Petitioner in 2006 revealed damage in Petitioner's frontal lobe.

The Missouri Supreme Court concluded Defense Counsel was not ineffective in failing to investigate or introduce the results of a PET scan. First, counsel did not fail to investigate the possibility: the Record establishes (and the Missouri Supreme Court found) that the possibility was considered and rejected because there was no guarantee the scan would reveal useful information. This potential had added significance because of the possibility that the test results might have to be shared with the prosecution, who would then have ammunition to counter the defense's planned theory. The decision not to pursue a PET scan was therefore seen as strategic and not the product of ineffectiveness. The Missouri Supreme Court also held that the PET scan results would have "merely corroborated the testimony of Drs. Smith and Gelbort," and "[t]he failure to develop or introduce cumulative evidence does not constitute ineffective assistance of counsel." Finally, the court concluded there was no showing of "a reasonable probability the jury would have recommended a life sentence" if the PET scan's results had been introduced. 290 S.W.3d at 708-09.

6

The Court concludes the Missouri Supreme Court's application of Strickland was reasonably applied to the facts of this case. See P.Tr. at 543-44, 547, 633-37.[4] First, Defense Counsel did not violate the performance prong: they considered ordering a PET scan and chose not to do so for legitimate strategic reasons.[5] Petitioner argues vehemently that the strategic choice allowed the state to discredit the testimony offered by pointing out the medical tests had not been performed. Essentially, Defense Counsel had a choice: seek a PET scan that might lead to unfavorable results that would provide a basis for impeachment, or eschew a PET scan and allow the prosecution to point out that medical testing was not done. The decision constituted a reasonable strategic decision, even if it did not achieve the desired result or was not the decision that Petitioner's current lawyers would have chosen. The performance prong was not violated, which constitutes a sufficient reason to reject this claim.

The cumulative nature of the evidence also suggests there is no prejudice. The PET scan would have confirmed the experts' testimony, but would not have added anything to it. Petitioner insists he has demonstrated that at least one juror would have voted not to impose the death penalty if medical evidence was introduced by pointing to a newspaper article where the jury foreperson was described (not quoted) as stating "the jury did not buy the evidence that Forrest had brain damage, depression and that when he was drinking or taking drugs excessively, his mental problems got worse." This argument is unavailing for several reasons. First, as noted, the article does not specify the exact words utilized. Second, it is an unsworn statement; while the article is part of the postconviction legal file it is not necessarily competent evidence. Third,

---

[4]"P.Tr. at ___" is a reference to the transcript of the hearing on Petitioner's postconviction motion.

[5]Turlington's testimony establishes that Defense Counsel went so far as to contact a hospital to arrange for a PET scan, but were told that a PET scan would not be approved unless an MRI demonstrated a need for a PET scan. Counsel were concerned about this additional step because they had reason to believe an MRI would not reveal any damage, meaning they would have the worst of all possible worlds: a medical test indicating no damage and no PET scan. P.Tr. at 544-45. The Missouri Supreme Court did not address this testimony.

7

jurors are generally precluded from offering testimony about their thought processes. Finally, it does not indicate that the lack of medical evidence was the deciding factor on the issue of brain injury, it does not indicate that evidence of the PET scan would have mattered, and it does not indicate what any juror would have done if he or she thought Petitioner had a brain injury.

Ultimately, the Missouri Supreme Court was left to do what courts are often required to do: evaluate the Record and render a judgment as to the likelihood that a proceeding's outcome would have been different. The Court cannot declare the Missouri Supreme Court's assessment was an unreasonable application of Strickland; to the contrary, the Court agrees that there is not a reasonable possibility that the sentence would have been different if the jury knew of the PET scan's results.

Another issue related to these same general factual matters involves medical records of prior head injuries. As explained by the Missouri Supreme Court, Petitioner's medical records were

> from hospital visits in the early 1990s for head injuries from being struck by a baseball bat and suicide attempts. The medical records from the baseball bat incident noted Forrest had a "closed head trauma with repair of 8 cm scalp laceration" but did not lose consciousness. Forrest's drug and alcohol use were mentioned in the medical records from the suicide attempts.

290 S.W.3d at 710. These records were available to and reviewed by the defense's experts, but Petitioner faults Defense Counsel for not admitting the medical records into evidence. Petitioner argues the records would have provided a firmer factual grounding for the experts' opinions, instead of leaving them to admit they relied on Petitioner's self-made reports about his medical history. The Missouri Supreme Court affirmed the finding that counsel had legitimate reasons for not seeking admission of the medical records. Those reasons included a combination of factors, including (1) they did not establish anything that was crucial, (2) the records were given to the experts for review, (3) there was concern about opening the door to further details about the baseball bat incident's connection to a drug deal, (4) there was no serious argument at trial regarding the existence of these prior injuries. 290 S.W.3d at 710.

8

Petitioner minimizes the effect of the drug deal associated with the baseball bat incident, arguing there was abundant evidence about his drug use. However, Kenyon testified in his deposition (which was admitted in evidence in the postconviction proceeding) that he and Turlington perceived a difference between evidence of Petitioner's drug use and his involvement in drug distribution. Kenyon Dep. at 34-35, 69-72; P.Tr. at 630. In any event, Defense Counsel's decision was not so deficient and unreasoned that it violates <u>Strickland</u>'s performance prong.

Separately, even if the performance prong was violated there is no prejudice arising from the failure to admit the records. The Missouri Supreme Court's decision affirming Defense Counsel's assessment that this was not a significant issue is confirmed by a review of the trial transcript. There is not a reasonable possibility that admission of the medical records would have affected any juror's decision.

### 2. Dr. Mark Cunningham

Dr. Cunningham is a clinical and forensic psychologist who explained that he was capable of addressing two topics: (1) childhood factors that constitute risk factors creating tendencies toward violence and illicit behavior and (2) a defendant's likelihood of committing future violent acts while in prison. P.Tr. at 258, 285-86. Petitioner focuses on the second topic, although at times he appears to contend counsel should have elicited testimony from the first topic as well.

Defense Counsel interviewed Dr. Cunningham and consciously elected not to call him as a witness. Defense Counsel explained that there was information suggesting Petitioner was involved in a homicide in California and he was concerned that Dr. Cunningham's analysis about Petitioner's future dangerousness could be impeached with such information. Kenyon Dep. at 19-20, 67-68. In addition, after preliminary discussions with Dr. Cunningham, Defense Counsel was concerned that his testimony would not be particularly helpful. Kenyon Dep. at 21-23, 69; P.Tr. at 520-21. Defense Counsel also believed Dr. Smith's testimony would adequately address issues related to

9

Petitioner's upbringing, making Dr. Cunningham's testimony cumulative and unnecessary. P.Tr. at 521.

The Missouri Supreme Court affirmed the postconviction court's conclusions in this matter, which it described as follows:

> The motion court found Dr. Cunningham's testimony was not credible because he "vastly underestimate[d]" the circumstances of the crimes, specifically the death of a law enforcement officer; he would alienate the jury by implying the jury could not analyze the mitigating evidence without his testimony; and he earned most of his income from testifying for capital defendants. Trial counsel made a strategic decision not to call Dr. Cunningham because evidence of another homicide may come out. Additionally, Dr. Cunningham's testimony was cumulative to evidence already admitted and Forrest was not prejudiced.

290 S.W.3d at 715.

Petitioner contends the Missouri Supreme Court's conclusion that Dr. Cunningham's testimony would have been cumulative is objectively unreasonable because Defense Counsel offered no evidence regarding Petitioner's future dangerousness. However, given the evidence and issues in the Record and the context of the statement quoted above, the Missouri Supreme Court was holding that Dr. Cunningham's testimony about Petitioner's childhood risk factors was cumulative – and this finding is not objectively unreasonable. Petitioner also argues that Defense Counsel's fears about the uncharged California murder were unreasonable because there were viable arguments to preclude the prosecution from using this information to impeach Dr. Cunningham. This may be true; however, the mere existence of arguments that might or might not work does not render Defense Counsel's strategic decision inappropriate. Defense Counsel had to balance the possibility of keeping the evidence out with the risk that the effort might fail. One could envision a circumstance in which Defense Counsel might be faulted for offering Dr. Cunningham's testimony precisely because it opened the door to use of the California murder as impeachment. Either way, Petitioner is complaining about a considered strategic decision that does not violate Strickland's performance prong.

Petitioner also argues strongly about the lack of any evidence on the issue of future dangerousness and contends, essentially, that Dr. Cunningham's testimony would have rebutted the prosecution's arguments. He invites the Court to revisit the state courts' assessment of Dr. Cunningham's credibility, but Petitioner misses the point of the state courts' findings. The state courts did not say Dr. Cunningham was not credible and therefore would not have been believed (an issue related to Strickland's prejudice prong); they found that Defense Counsel's assessment of Dr. Cunningham's credibility was justified, so there was no violation of the performance prong. Indeed, decisions as to which witnesses to call are strategic decisions. Defense Counsel interviewed Dr. Cunningham for the purpose of evaluating his usefulness as a witness. After that interview, Defense Counsel believed there was a risk Dr. Cunningham would be more harmful than helpful and purposely chose not to call him. This is the most significant aspect of Defense Counsel's decision, and is the most significant reason why relief must be denied. Defense Counsel's decision was reasonable (even if it is second-guessed and disagreed with now) and did not violate Strickland's performance prong.

### *3. Other Witnesses*

Petitioner faults Defense Counsel for failing to call Dennis Smock, Curt Fuller, and Anthony Jacobs as witnesses during the penalty phase. The Missouri Supreme Court summarized the evidence they could have provided as follows:

> Anthony Jacobs, Forrest's friend, testified at the post-conviction hearing that Forrest often used drugs and alcohol and that he was good with children. Trial counsel accidentally became aware of Jacobs when attempting to find Doug Del Mastro, another witness. Curtis Fuller, Forrest's childhood neighbor, testified that Forrest's father yelled at and hit Forrest as a child and that Forrest's father frequently drank. Dennis Smock, Forrest's former employer, testified that Forrest was a hard worker who had to be supervised and that he introduced Forrest to the Mormon Church. Trial counsel testified there was no strategic reason not to call the witnesses at trial.

11

290 S.W.3d at 710-11. The court went on to hold there was no prejudice from the failure to call these witnesses:

> Trial counsel's performance was not deficient by failing to call Jacobs, Fuller, and Smock in the penalty phase to testify to Forrest's drug and alcohol use, childhood, religion, and that he was good with children. That information was elicited from the penalty phase testimony of Forrest's brother, his former girlfriend's children, and other friends. Trial counsel was not ineffective for not offering the cumulative testimony from Jacobs, Fuller, and Smock.

Id. at 711. A review of the Trial Transcript confirms that this testimony was cumulative. Witnesses providing information of this sort came from William Forrest, Heidi Enriquez, Carl Cragholm, Bonnie Sharp, Priscilla Young, Colton Young, Nancy Young, Susan Del Mastro, Doug Del Mastro, Linda Gamblin, William Potsman, and Clayton Forrest. Assuming there was some violation of the performance prong,[6] the post-hoc assessment that these three witnesses were somehow "better" is unsupported by the Record[7] and insufficient to establish prejudice.

## B. The Alleged "Deal" With Eddie Starks

Eddie Starks was a witness at trial. At the time of trial he was facing charges for possession of a controlled substance and domestic assault. Petitioner believes there was some sort of deal between Starks and the prosecutor related to these charges that was not disclosed at trial, and the failure to disclose this deal violated Brady v.

---

[6]Defense Counsel endeavored to contact the individuals Petitioner identified to them. Petitioner did not identify Jacobs or Fuller. While Defense Counsel learned of Jacobs' existence as Petitioner's friend, the Court is not convinced Strickland's performance prong requires counsel to talk to every person in the universe known to have had a relationship with the defendant. It was reasonable to focus on the individuals Petitioner identified.

[7]Petitioner argues that neutral third-parties would be more credible than family members. This is a factor, but not a legal maxim that compels the result he seeks. Moreover, not all of the witnesses who testified were family members.

Case 4:09-cv-08002-ODS   Document 38   Filed 05/11/12   Page 12 of 25

Maryland, 373 U.S. 83 (1963). Petitioner seeks leave to conduct discovery on this issue. The Court concludes (1) there is no basis for Petitioner's belief that a deal existed, (2) there is no basis for permitting discovery to determine whether a deal existed, and (3) Petitioner is not entitled to relief in any event.

### 1. Procedural Matters

Respondent initially contended this claim was not exhausted but invited the Court to deny it on the merits. In response to the Court's Order (Doc. # 32), Respondent modified its position and "waive[d] the exhaustion defense . . . without any qualification." (Doc. # 33). There is now no reason to determine whether the claim has been exhausted because even if it has not been exhausted Respondent has waived the defense.

Respondent also argues the claim has been procedurally defaulted because it was not presented to the state courts for consideration. A habeas petitioner is required to fairly present his claim to the state court; that is, he must present the same facts and legal theories to the state court that he later presents to the federal courts. Morris v. Norris, 83 F.3d 268, 270 (8th Cir. 1996). In addition, it is not enough for Petitioner to simply raise the arguments; they must be raised in a manner that complies with state law. Failure to do so constitutes a procedural default. Sweet v. Delo, 125 F.3d 1144, 1151 (8th Cir. 1997), cert. denied, 523 U.S. 1010 (1998).

"Unless a habeas petitioner shows cause and prejudice, a court may not reach the merits of . . . procedurally defaulted claims in which the petitioner failed to follow applicable state procedural rules in raising the claims." Sawyer v. Whitley, 505 U.S. 333, 337-39 (1992) (citations and emphasis omitted). There is significant overlap between the cause and prejudice required to overcome a procedural default and the substantive components of a Brady claim. E.g., Banks v. Dretke, 540 U.S. 668, 690-91 (2004). In addition, "judicial economy sometimes dictates reaching the merits if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated." Barrett v. Acevedo, 169 F.3d 1155, 1162 (8th Cir.) (en banc), cert. denied,

13

528 U.S. 846 (1999).  Given the similarity of issues involved, the Court deems it more expedient to simply address the merits of Petitioner's Brady claim.[8]

*2. Background*

*(a) Evidence at Trial*

Starks testified he was Harriett Smith's boyfriend and was in her house the morning of the murders – December 9, 2002 – having spent the previous night there. T.Tr. at 869, 872.  Wells came to the house around 9:30 a.m., and Starks went into the computer room.  T.Tr. at 873.  At some point, he overheard a conversation between Smith and Petitioner that culminated with shots being fired.  T.Tr. at 874-76.  Starks hid in a closet before attempting to sneak out of the house through the basement.  On his way to the basement he saw Wells on the couch; he had been shot.  T.Tr. at 876-77. He exited out the back door from the basement and went to a neighbor's house; on the way, he observed Petitioner near a pickup truck by the mail box.  T.Tr. at 878.  Starks used the phone to call Karen Workman to come get him; during the conversation he told her that Petitioner had shot Wells and that he had been unable to find Smith.  T.Tr. at 843-44.  After picking up Starks at the neighbor's house, Workman, her daughter (who was driving) and Starks returned to Smith's house where they found Wells on the couch and Smith in her bedroom.  Both individuals were dead.  T.Tr. at 845.

Starks was asked about his prior criminal convictions during cross-examination. Defense Counsel then attempted to ask questions about the pending charges, which were filed in the Summer of 2004 – almost a year and a half after the murders, and almost a year and a half after Starks first discussed the murders with law enforcement officials.  The trial court permitted Defense Counsel to ask Starks to identify the pending charges; in response to those questions Starks testified he was facing pending criminal charges for domestic assault and possession of methamphetamine and that the

_____

[8]This decision makes it unnecessary to consider application of the Supreme Court's recent decision in Martinez v. Ryan, 132 S. Ct. 1309 (2012).

14

prosecutor on those charges was James Gray, the Dent County prosecutor and a member of the prosecution team. T.Tr. at 899-901.

In addition to relating the events of that day to Workman, Starks spoke on at least two occasions with law enforcement officials: once at the scene, T.Tr. at 831, 835, and again that night. T.Tr. at 1058-59. According to Defense Counsel's closing argument, Starks also testified at the preliminary hearing, T.Tr. at 1255-56, which took place in April 2003.

In placing Starks' testimony in context with the other evidence at trial, it is important to note that he did not provide any information regarding the murder of Deputy Barnes. It should also be noted that he did not testify actually seeing Petitioner shoot anyone. With respect to his testimony about the murders of Smith and Wells, Starks' testimony constituted circumstantial evidence that was corroborated in a variety of ways. Angelia Gamblin[9] testified that she waited in her green Dodge Stratus while Petitioner was in Smith's house on December 9. Smith ran out of her house in a panic, got into Gamblin's car, and drove it near the mailbox – at which point she stopped because she ran over something. T.Tr. at 1068-69. Petitioner followed Smith out of the house carrying a gun, which he fired in the air. T.Tr. at 1070. Gamblin identified the gun as one she purchased at Petitioner's request for target shooting, T.Tr. at 1074, 1081, and other evidence confirmed this point. T.Tr. at 1106-08. Petitioner and Smith returned to Smith's house, at which point Gamblin noticed blood on the driver's seat. T.Tr. at 1071-72. Forensic testing confirmed the blood on the seat belonged to Smith. T.Tr. at 1159-63, 1170. Later, Petitioner returned to the car, carrying the gun and a metal lock box. T.Tr. at 1073. Petitioner shot open the lockbox, which contained methamphetamine. Other witnesses testified that Smith kept a metal lockbox containing methamphetamine under her bed. T.Tr. at 848-49. Starks identified the lockbox recovered at Petitioner's house (the same one Gamblin testified she saw Petitioner open) as belonging to Smith. T.Tr. at 881-82. Ballistic testing suggested the gun Petitioner was carrying was used to kill all three victims. T.Tr. at 1139-46.

---

[9]Angelia had married by the time of trial. Consistent with the practice of the state courts, the Court will use her maiden name.

<u>*(b) The Pending Charges Against Starks*</u>

The Court has reviewed *in camera* materials submitted by the Dent County Prosecutor's Office, the Office of the State Public Defender (which represented Starks) and the state courts. Those materials confirm both charges in question (misdemeanor domestic assault and felony drug possession) were brought more than eighteen months after the crimes occurred and more than a year after Starks testified at the preliminary hearing. While the domestic assault charge was filed approximately four months before Petitioner's trial and dismissed approximately six weeks after, there is nothing in the records to suggest there was an agreement to dismiss the charge in exchange for testimony. The drug possession charge was filed approximately three months before Petitioner's trial and dismissed three months after, but there is also nothing in these files reflecting any sort of agreement between the prosecutor and Starks.[10]

### *3. Analysis*

Petitioner's <u>Brady</u> claim requires three elements. "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." <u>Morales v. Ault</u>, 476 F.3d 545, 554 (8th Cir.), <u>cert. denied</u>, 552 U.S. 873 (2007). Prejudice exists if the undisclosed evidence undermines confidence in the verdict, <u>Strickler v. Greene</u>, 527 U.S. 263, 290 (1999), or creates a reasonable probability that the verdict would have been different. <u>Morales</u> 476 F.3d at 554. The prosecution's good faith (or bad faith) does not matter. <u>E.g.</u>, <u>Kyles v. Whitley</u>, 514 U.S. 419, 432 (1995).

---

[10]The records also reflect no involvement by the Missouri Attorney General's Office, which the Court mentions only because of Petitioner's repeated entreaties that the Court consider the fact that the Assistant Attorney General involved in this prosecution allegedly has a "shameful history" of committing <u>Brady</u> violations. The Court will not comment further on Petitioner's inappropriate *ad hominem* attack.

"One of the fundamental tenets of <u>Brady</u> is that exculpatory evidence was actually suppressed." <u>Morales</u>, 476 F.3d at 555. Starks testified truthfully when he said the charges were pending and when he described the nature of those charges. While the charges were later dismissed, there is no indication that a deal was in place at the time Starks testified in Petitioner's trial. Petitioner argues that his suspicions justify affording him an opportunity to conduct discovery to see if a deal existed, but his suspicions lack any basis. The mere fact that charges were later dismissed does not indicate a deal existed, much less that a deal existed at the time of Petitioner's trial. Petitioner has no other basis for believing that a deal existed when Starks testified. Finally, the Court's independent *in camera* review of the materials (some of which would be beyond Petitioner's reach because of Starks' attorney/client privilege)[11] confirm that there were no plea negotiations. Petitioner's discovery request is a fishing expedition.

Assuming, *arguendo*, that a deal existed, relief would still be denied because the failure to divulge its existence would not have prejudiced Petitioner. Impeachment information must be divulged, and Petitioner argues the existence of a deal with the Dent County Prosecutor could have demonstrated Starks was testifying in a manner designed to curry favor with the prosecutor. There is a fatal flaw in this reasoning, which is that the events giving rise to the charges against Starks occurred *after* he told law enforcement officials about Petitioner's involvement in these murders. Starks' testimony was consistent with what he told the police in 2002. Starks' testimony was consistent with what he told other witnesses in 2002. Starks testimony is presumably[12] consistent with his testimony at the preliminary hearing in 2003. Any argument that

_____

[11]In particular, Petitioner could not elicit testimony from Starks' counsel or obtain review of his attorneys' records. The Court issued an Order seeking a copy of Starks' counsel's file in March 2012, but due to human error this Order was not delivered to the Office of the State Public Defender. A second Order was issued in April 2012, and the Office of the State Public Defender provided copies of its files for *in camera* review.

[12]If Starks' testimony at trial was materially different from his testimony at the preliminary hearing, the Court presumes Defense Counsel would have impeached Starks (or that a claim about Defense Counsel's failure to do so would have been raised in this proceeding).

Starks' trial testimony in 2004 was fabricated in order to curry favor on charges filed in 2004 simply makes no sense, and could not have had any effect on the jury's evaluation of the evidence.[13]

### C. Defense Counsel's Failure to Object to Evidence of Petitioner's Prior Convictions

Karen Workman made two brief, unsolicited comments indicating Petitioner had previously been in prison. The first occurred during direct examination; the questions and answers at issue appear below:

Q:   At some point in time, did you become aware that there had been a falling out between [Petitioner and Smith]?

A:   Yes.

Q:   And how did you – what – what did you hear or what did you learn about that, if anything?

A:   They, I guess had grown apart a little bit because Earl was wanting [Smith] to buy him a lawnmower and a trailer, and she wasn't going to.

Q:   And that would seem to be the center of the dispute?

A:   Yes. And that he really didn't do the things he said he was going to do when he would write her from prison; mainly, help around the house, do – cutting wood, and because her knees were bad and her back was bad, and he just said he was going to come back and help her out a lot and –

Q:   – and did not do that.

A:   Not the extent that he said. No.

T.Tr. at 840-41. The second reference occurred during cross-examination:

---

[13]The Court also notes that at no time – not at trial, and not now – does Petitioner suggest that anyone else committed the shooting. As noted on page 2, *supra*, the defense strategy did not involve disputing that Petitioner was the shooter, but rather disputing that Petitioner had the requisite mental state for first degree murder.

Q: Okay. Now, when [Smith] and Earl had this agreement - or excuse me. When – when Earl hooked [Smith] up with this drug source in California, was [she] living in Salem?

A: Yes.

Q: And was Earl at that time living in California, to the best of your knowledge?

A: I think he had just gotten out of prison in California.

Q: And he was living in California at the time?

A: Yes.

T.Tr. at 854.

Defense Counsel did not object to either of Workman's references to Petitioner's prior incarceration. Kenyon testified that he did not object because he did not want to highlight these fleeting references for the jury. Turlington testified she would not have objected if the issue had been raised with the jury during voir dire, which was done in this case. The postconviction court denied relief, concluding (1) Defense Counsel had strategic reasons for not objecting and (2) the "two brief references" had no effect on the proceedings given the strength of the State's case. Respondent's Exhibit J-2 at 383-84.[14]

Petitioner did not testify at the trial, and there seems to be little doubt that evidence of Petitioner's prior convictions was inadmissible at the guilt phase. The real issue, however, is whether the failure to object in this case (1) constituted deficient performance and (2) prejudiced Petitioner. Petitioner insists the answer to both questions is "yes" because an objection would have resulted in a curative instruction. However, Kenyon could justifiably believe the curative instruction would cause more harm than the situation he sought to cure: Workman's statements were brief and

_____

[14]This issue was not raised on appeal to the Missouri Supreme Court and Respondent argues this constitutes a procedural default, but this argument appears foreclosed by the Supreme Court's subsequent decision in <u>Martinez v. Ryan</u>, 132 S. Ct. 1309 (2012). The Court concludes the prudent course is to address Petitioner's claim on its merits.

isolated, and asking the jury to disregard the comments would have called far more attention to the matter. Attorneys frequently decline to object for precisely this reason, and Kenyon's assessment does not constitute deficient performance.

Petitioner also seems to suggest that reversal would have been automatic. The Missouri Supreme Court has held that "[e]vidence of prior criminal acts is *never* admissible for the purpose of demonstrating the defendant's propensity to commit the crim with which he is presently charged." State v. Ellison, 239 S.W.3d 603, 606 (Mo. 2007) (en banc). Prior convictions are admissible for other purposes. Id. at 606-07. However, Workman's statements were not offered to prove Petitioner's propensity; indeed, Workman did not indicate why Petitioner was in prison, so propensity could not have been her objective. More importantly, it is quite clear that neither Defense Counsel nor the prosecution sought to elicit these comments. In any event, reversal would not have been automatic, e.g., State v. Ward, 242 S.W.3d 698, 704-05 (Mo. 2008) (en banc) (identifying factors to apply when "analyzing the prejudicial effect of uninvited reference to other crimes evidence"); State v. Goff, 129 S.W.3d 857, 866 & n.7 (Mo. 2004) (en banc) (same), and there was no possibility of a different outcome either at the trial or appellate levels.

### D.  Defense Counsel's Failure to Object to the Photograph of a Hunting Knife

A nine-and-a-half inch hunting knife was found on Petitioner's belt when he was arrested. A photograph of this knife was introduced into evidence at trial.[15] Petitioner argues Defense Counsel should have objected because the knife was irrelevant to the charge of shooting three people. The Missouri Supreme Court concluded Petitioner failed to establish that the photograph was inadmissible, meaning Defense Counsel were not shown to have performed deficiently in failing to object. The court also

---

[15]At one time there was confusion as to whether the photograph depicted the knife retrieved from Petitioner or another knife found in the house. The state courts resolved this factual dispute, determining that the knife in the photo was the knife taken from Petitioner's person. 290 S.W.3d at 711.

concluded there was no prejudice, observing that evidence Petitioner had a hunting knife "pales in comparison" to his use of a firearm that day. 290 S.W.3d at 711-12.

In this proceeding, Petitioner fails to explain why the Missouri Supreme Court's decision is unreasonable. In particular, the Missouri Supreme Court's determination that there was no valid evidentiary objection to be made is a decision to which deference is due because the Missouri Supreme Court is the final arbiter of state law. In any event, the Court agrees that even if an objection could have been made, there is no possibility that the jury's verdict on guilt would have been different if the photograph had not been introduced into evidence.

## E. Improper Closing Arguments

The controlling case with respect to prosecutorial misconduct in closing argument is Darden v. Wainwright, 477 U.S. 168 (1986). "[U]nder Darden, habeas relief is only appropriate if a prosecutor's improper closing argument so infected the trial with unfairness as to make the resulting conviction a denial of due process." Cole v. Roper, 623 F.3d 1183, 1194 (8th Cir. 2010) (quotations from Darden omitted). "Under this standard, a petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial--i.e., that absent the alleged impropriety, the verdict probably would have been different." Newlon v. Armontrout, 885 F.2d 1328, 1336-37 (8th Cir. 1989), cert. denied, 497 U.S. 1038 (1990) (quotations omitted); see also Darden, 477 U.S. at 181; Stringer v. Hedgepeth, 280 F.3d 826, 829 (8th Cir. 2002). A similar standard applies with respect to closing arguments presented at the penalty phase. E.g., Copeland v. Washington, 232 F.3d 969, 973-74 (8th Cir. 2000), cert. denied, 532 U.S. 1024 (2001). Of course, the need to consider prejudice arises only if the prosecutor's argument is actually improper – and that is not the case here.

21

## 1. Guilt Phase

Under Missouri law, "[t]he difference between first and second degree murder is the element of deliberation." State v. Santillan, 948 S.W.2d 574, 576 (Mo. 1997) (en banc). As stated earlier, this issue was the focal point of the trial's guilt phase. Petitioner faults the prosecutor for focusing the jury on the passage of time instead of confining himself to the language from the jury instructions indicating deliberation required "cool reflection." He argues the prosecutor essentially indicated "deliberation" was satisfied if there was any passage of time between gunshots. The Missouri Supreme Court rejected this argument, and so does this Court. First of all, passage of time is a factor that can be considered in determining whether someone has "coolly reflected" or deliberated, and the prosecutor was entitled to emphasize evidence supporting the State's theory of the case. Second, the prosecutor did not argue that passage of time alone was sufficient. Considering the statements in context, T.Tr. at 1261-62, the prosecutor did not misstate the law. Third, the Missouri Supreme Court found no misstatements, describing the closing argument as containing "appropriate inferences based upon the facts in the record." 183 S.W.3d at 228. Petitioner offers no argument suggesting the Missouri Supreme Court's resolution on direct appeal was unreasonable.

## 2. Penalty Phase

Petitioner finds fault with several statements in the prosecution's penalty phase argument; each one was considered by the Missouri Supreme Court and rejected. 183 S.W.3d at 228. The factual errors Petitioner complained of were found to be fair inferences from the Record. The misstatements of law alleged by Petitioner were held to be correct statements of Missouri law. In proceedings before this Court, Petitioner essentially reiterates his prior arguments, but offers nothing to suggest the Missouri Supreme Court was wrong – much less unreasonable – in its assessment of the Record and its application of federal law.

22

## F.  Inflammatory Victim Impact Testimony

Lois Lambiel, Deputy Barnes' sister, testified at the penalty phase about the effect of Deputy Barnes' death on the family.  Petitioner concedes such evidence is permitted, but contends Lambiel's testimony was infirm because (1) some of it was hearsay, (2) some of it violated the Confrontation Clause, (3) Lambiel improperly testified that other siblings became ill or died as a result of Deputy Barnes' murder, and (4) the evidence was generally too inflammatory.

Petitioner does not identify the out of court statements Lambiel testified about that were offered for the truth of the matter asserted.  The Court's independent review fails to unearth any hearsay.  The Confrontation Clause arguments rest on the alleged hearsay, and they fail for the reason just stated.

The Court has reviewed Lambiel's statements about her brothers, one of whom she described as experiencing five strokes after Deputy Barnes' death and the other who died six months after Deputy Barnes.  T.Tr. at 1349-50.  Taken in context, the Court agrees with the Missouri Supreme Court's assessment: "there was no testimony directly linking, or even suggesting, that their deteriorating health was in any way related to Ms. Barnes's murder."  183 S.W.3d at 225.

Petitioner's final argument relates to statements Lambiel made at the sentencing hearing, wherein she essentially asked the sentencing judge to impose the death penalty.  T.Tr. at 1780.  These statements were not only made outside the jury's presence, but were made approximately two months after the jury returned its verdicts recommending the death penalty be imposed.  As the Missouri Supreme Court concluded, "[t]here is no possible way that this statement could have influenced the jury's recommendation."  183 S.W.3d at 225-26.

## G.  The Voluntary Intoxication Instruction

Instruction No. 5 instructed the jury as follows:

Case 4:09-cv-08002-ODS   Document 38   Filed 05/11/12   Page 23 of 25

> The state must prove every element of the crime beyond a reasonable
> doubt. However, in determining the defendant's guilt or innocence, you
> are instructed that an intoxicated or drugged condition whether from
> alcohol or drugs will not relieve a person from responsibility for his
> conduct.

Respondent's Exhibit B-3 at 576. This instruction is predicated on section 562.067 of

the Revised Missouri Statutes, and both the statute and the wording of Instruction No. 5

have been held to be constitutional. Gary v. Dormire, 256 F.3d 753, 758-60 (8th Cir.

2001). Petitioner's argument that the instruction violates the Due Process Clause by

impermissibly reducing the State's burden to prove the required mental state is

foreclosed.


### H. Exclusion of Venirepersons Parrott and Geiger


Petitioner contends the trial court improperly allowed the removal of two

prospective jurors for cause. Prospective jurors may be removed for cause if their

views on capital punishment would prevent or substantially impair their ability to fully

and fairly consider all possible punishments. Wainwright v. Witt, 469 U.S. 412, 420

(1985). The bias against the death penalty need not be evident with unmistakable

clarity because such clarity is rarely evident; instead, the matter is one that is

"peculiarly" within the trial judge's province. Kinder v. Bowersox, 272 F.3d 532, 543 (8th

Cir. 2001); see also Uttecht v. Brown, 551 U.S. 1, 22 (2007).

The Court will not set forth the answers provided by Venirepersons Parrott and

Geiger. It is sufficient to say that, having reviewed, them, there is ample justification for

the trial court's conclusion that these members of the panel could not fully and fairly

consider imposing the death penalty. T.Tr. at 527-30, 533-34, 570-71, 575-76. The

Missouri Supreme Court's affirmance on this point is based on reasonable factual

findings and applications of federal law. 183 S.W.3d at 231. Relief on this claim is not

warranted.

<u>*I.*  Failure to Include Statutory Aggravators in the Information</u>

Petitioner's ninth point alleges his rights were violated because the statutory aggravating factors were not contained in the information.  He concedes this argument is foreclosed by the Eighth Circuit's decision in <u>United States v. Allen</u>, 406 F.3d 940 (8th Cir. 2005) (en banc), <u>cert. denied</u>, 549 U.S. 1095 (2006), but presents the argument to preserve it for further review.  On the strength of <u>Allen</u>, this claim is rejected.

<u>III.  CONCLUSION</u>

For these reasons, Petitioner's request for habeas corpus relief pursuant to 28 U.S.C. § 2254 is denied.

IT IS SO ORDERED.


/s/ <u>Ortrie D. Smith</u>        
ORTRIE D. SMITH, SENIOR JUDGE
UNITED STATES DISTRICT COURT

DATE: May 11, 2012

Case 4:09-cv-08002-ODS   Document 38   Filed 05/11/12   Page 25 of 25